**GLM PARTNERSHIP, Appellant,**

v.

**HARTFORD CASUALTY INSURANCE COMPANY, Appellee.**

No. 99–CV–264.

District of Columbia Court of Appeals.

Argued March 14, 2000.

Decided May 11, 2000.

John G. Gill, Jr., Rockville, MD, for appellant.

Jeffrey A. Wothers, Baltimore, MD, for appellee.

Before STEADMAN, FARRELL and GLICKMAN, Associate Judges.

STEADMAN, Associate Judge:

A building owned by appellant GLM Partnership (GLM) was destroyed in a fire. Appellee Hartford Casualty Insurance Company (Hartford) was the insurer of the building. GLM brought a negligence action against Hartford to recover the difference between its claimed actual loss and the lesser coverage provided by the policy. The trial court dismissed the action. Because GLM executed a valid release of all claims against Hartford upon receipt of the insurance payment for the subject loss, we affirm.

## I.

Although some facts have been disputed, the following material facts have been acknowledged by both parties. GLM owned the property at 5601–5611 Georgia Avenue, N.W., Washington, D.C., which housed Morton's Department Store. Since at least 1981, GLM used Catucci, Farley & Snider, Inc. (Catucci), as an independent insurance agent, through whom it purchased coverage from various insurance companies. Beginning in 1985, GLM, through Catucci, contracted with Hartford to provide insurance coverage for the real property in question.

Although the insurance policy was nominally a "replacement cost" policy, by its terms any recovery was ultimately limited by the amount of insurance actually purchased by GLM. The policy also included an automatic inflation guard, which, according to GLM, was intended to automatically increase insurance coverage by 4% for each year of the policy.[1] In addition, the policy stated that "[n]o one may bring a legal action against us under the Coverage ... unless ... the action is brought within 2 years after the ... loss." By 1987, GLM carried fire insurance in the amount of $842,625 covering the property.

Prior to GLM's renewal of its policy for 1988, Hartford contacted Catucci. Hartford informed the agent that it estimated the value of the property at only $600,000 and suggested that GLM was over-insuring. Subsequently, GLM renewed its policy with Hartford, through Catucci, to reflect coverage of only $600,000.

On August 5, 1993, the property was destroyed by fire. On November 22, 1993, Hartford tendered a check to GLM in the amount of $763,066.67, of which $674,960 represented the total amount of fire insur-

---

1. Hartford contests this construction of that term of the policy, although it does not dispute that an inflation guard provision was included in the contract.

ance coverage at the time of the loss.[2] In connection with the insurance payoff, an agent for GLM executed a "Sworn Statement in Proof of Loss." The statement acknowledged that GLM agreed with Hartford as to the total amount of loss to the building, the actual cash value of the property at the time of the fire, and the amount of insurance coverage. On the same date, the same GLM agent executed a "Subrogation Receipt" (Receipt). On its face, the Receipt acknowledged receipt of the insurance check as "full payment, release and discharge of all claims or demands" against Hartford "arising from or connected with" the fire loss.

On August 5, 1996, three years after the fire, GLM filed a negligence action against Hartford for $600,000.[3] In its complaint, GLM alleged that the amount paid by Hartford failed to cover a significant portion of its loss, and that Hartford was responsible for the under-insurance. The case was founded on a compilation of theories arising from Hartford's alleged fiduciary duty towards its insured. GLM claimed that Hartford negligently reduced coverage on the building. It asserted that Hartford underestimated the value of the property by basing its estimate on an incorrect square-footage measurement. GLM also alleged that for the years 1992 and 1993 Hartford failed to automatically increase coverage pursuant to the inflation protection provision of the policy. Finally, GLM claimed that Hartford negligently failed to offer GLM the option of environmental and site cleanup insurance.

Hartford's renewed motion to dismiss or, in the alternative, for summary judgment[4] was granted by the trial court on the ground that the suit was in substance one brought under the policy and thus barred by the two-year statute of limitations provided in the policy terms.[5] GLM appeals this ruling.[6]

## II.

The disposition of this case on appeal is governed by the oft-repeated standard of review for a grant of summary judgment.

We review the grant or denial of a summary judgment motion *de novo*. *See Walton v. District of Columbia*, 670 A.2d 1346, 1353 (D.C.1996). Summary judgment is appropriate only if no genu-

---

2. The base insurance of $600,000 was increased yearly, ostensibly under the inflation guard provision, from 1989 thru 1991. In 1992, the resultant coverage equaled $674,-960. In 1993, the insurance policy was renewed, and coverage was set at the identical level of $674,960. The balance of the insurance payoff represented loss of rents, payable under separate coverage also provided for by the terms of the policy, not at issue here.

3. The complaint alleged $322,517.58 in damages resulting from under-insurance, and an additional $153,901.00 in damages to cover environmental cleanup, which GLM claimed Hartford negligently failed to insure against. GLM also alleged other damages, including interest costs, attorneys fees and unspecified expenses.

4. On May 12, 1997, GLM had moved to amend the complaint and on June 2, 1997, Hartford had filed a motion to dismiss or for summary judgment. On May 11, 1998, the trial court granted the motion to amend and denied Hartford's motion "without prejudice." Hartford filed its renewed motion on October 30, 1998, which the trial court granted on January 26, 1999.

5. In dismissing the action under the contract provision, the trial court did not comment on Hartford's primary argument that GLM executed a valid release from all claims.

6. Although the trial court's order formally reflected a grant of appellee's motion to dismiss, Hartford supported the motion with documents presenting facts not pled in the complaint, and the trial court clearly relied on those documents, specifically the insurance contract. As such, we review the dismissal as a grant of Hartford's alternative motion for summary judgment. *Kitt v. Pathmakers, Inc.*, 672 A.2d 76, 79 (D.C.1996) ("When the trial court decides a Rule 12(b)(6) motion by considering factual material outside the complaint, the motion shall be treated as if filed pursuant to Rule 56, which permits the grant of summary judgment if there are no material facts in dispute and the movant is entitled to judgment as a matter of law.")

ine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C. 1994) (en banc). It is " 'properly granted if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, could not find for the nonmoving party, (3) under the appropriate burden of proof.' " *Kendrick v. Fox Television*, 659 A.2d 814, 818 (D.C. 1995) (quoting *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)).

*Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 858 (D.C.1999).

### A.

■■■ We begin by noting that "[a] release is a form of contract, and the rules of contract construction govern its interpretation. . . . Where the language is clear and unambiguous, its plain language is relied upon in determining the parties' intention. Where the terms of the document leave no room for doubt, the effect of the release can be determined as a matter of law." *District of Columbia v. Washington Hosp. Center*, 722 A.2d 332, 342 (D.C.1998) (citing *Lamphier v. Washington Hosp. Center*, 524 A.2d 729, 732–35 (D.C.1987)); *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C. 1990) (whether a contract is unambiguous is a question of law reviewed *de novo* on appeal); *see also Bolling Federal Credit Union v. Cumis Ins. Soc., Inc.*, 475 A.2d 382, 385 (D.C.1984) ("If the release is facially unambiguous, we must rely solely upon its language as providing the best objective manifestation of the parties' intent.")

■■■ We think the release here is plain on its face. In sweeping terms, it provides for a comprehensive settlement of all claims or demands by GLM against Hartford connected in any way with the August 5 fire loss. It reads in this regard as follows: "Received from Hartford Ins. Co. the sum of $763,066.67 in full payment, release and discharge of all claims or demands against the said Company, arising from or connected with any loss or damage on or to Building & Loss of Rents at 5601–5611 Georgia Ave., N.W., Washington, D.C., Property Owned by GLM Partnership which loss or damage arose or occurred on or about the 5th day of August 1993." We do not see how the language could have been much clearer. It unambiguously purports to release Hartford from any claims for loss brought by GLM, whether on the contract or otherwise. *Bolling, supra*, 475 A.2d at 385 (contract should be construed as a whole "so as to give meaning to all of the express terms").

The present case is dissimilar to prior decisions where, faced with the issue of multiple-defendant liability, we have refused to treat a purportedly "general" release as a valid disclaimer in certain situations. In those scenarios, unlike here, we were faced with a release whose terms did not specifically extend its provisions to cover entities who were not a party to the release contract. *See, e.g., District of Columbia v. Washington Hosp. Center, supra*, 722 A.2d at 332; *Noonan v. Williams*, 686 A.2d 237, 245 (D.C.1996); *Lamphier v. Washington Hosp. Center*, 524 A.2d 729, 732 (D.C.1987). Conversely, the release here was executed by the party against whom it is sought to be enforced and clearly states that "all claims" for "any loss" are released. *See Bolling, supra*, 475 A.2d at 385 (contract, executed by adversary, providing that party was released from liability for "all claims of any kind" acted as valid release of all claims).

It is true that, following the general release language quoted above, the policy contains a further provision that the tendered sum is "in full payment, release and discharge of all claims or demands against the said Company under the certain policy of insurance made by said Company and numbered 42UWAA0601 arising upon or connected with any such loss or damage," in addition to a subrogation provision as-

signing to Hartford all claims that GLM might have against third parties. GLM argues in effect that these latter provisions should be the only operative ones, and that the release therefore did not bar a suit founded in negligence. The mere fact that the release did not use the terms "negligence" or "tort" did not render invalid its application as a general release. *See, e.g., Derzavis v. Security Storage Co. of Washington,* 703 A.2d 839, 840 (D.C.1997) (relinquishment of right to sue on "any claim" for "damage" to property, "barred [plaintiff] from asserting a claim for breach of contract or negligence"). On the contrary, the fact that the release contract here failed to specifically reserve GLM's right to file claims against Hartford beyond the contract supports an interpretation that the release of "all claims" meant just that. *See Bolling, supra,* 475 A.2d at 386 (defendant "may not have known the extent of its losses when it signed the release agreement, but it did have the means to articulate and bargain for appropriate language of reservation, if that was its intent").[7] Nor does the fact that the release contains a clause specifying its operation with respect to claims under the insurance policy limit the more general language of the opening provision. *Id.* at 385 (contract which purported to release both specified claims as well as "all claims of any kind or character," acted as a valid release for all "losses of which [contracting party] had knowledge, as well as those which existed but were not yet identified, at the time the release was signed"; contract should be construed as a whole "so as to give meaning to all of the express terms").

■ GLM also suggests that the Subrogation Receipt is invalid as a general release because GLM was somehow misled in executing the agreement. We can see no basis for such an assertion. This was a business transaction between two sophisticated entities involving substantial sums and we have often said that, under such conditions, parties are bound by what they sign. *See, e.g., Isaac v. First Nat. Bank of Maryland, D.C.,* 647 A.2d 1159, 1162 (D.C. 1994) ("it will not do for a man [or woman] to enter into a contract, and, when called on to respond to its obligations, to say that he [or she] did not read it when he [or she] signed it, or did not know what it contained") (citation omitted); *Joseph M. Silverman, Inc. v. Harrison,* 498 A.2d 193, 196 (D.C.1985) ("experienced businessman and sophisticated property owner" could not viably claim he was unaware of contract clause because "[i]t was incumbent upon him to read the contract, and if he believed the language of the contract to be ambiguous, he should have requested clarification or modification of the language").

**B.**

■ GLM next argues that, even if the release is read as protecting Hartford from all liability, it is unenforceable for want of consideration. "[A] release, like any other contract, must be supported by sufficient consideration, and the consideration is not sufficient unless the releasor receives something of value to which he or she had no previous right." *Interdonato v. Interdonato,* 521 A.2d 1124, 1134 (D.C. 1987). Thus, if GLM had a previous fixed right to the payment of $763,066.67, the acceptance of payment in that amount would not constitute consideration for the release. GLM argues that Hartford had a pre-existing duty to make the insurance payment in the amount assigned by GLM in its "Sworn Statement of Loss." This argument ignores the specific terms of the insurance policy.

---

7. *Cf. Corto v. National Scenery Studios, Inc.,* 705 A.2d 615, 624 (D.C.1997) (settlement which "expressly reserved ... rights to file claims against [third party]" necessarily could not act to protect third party from suit); *Knight v. Cheek,* 369 A.2d 601, 603 (D.C.1977)

("Where the creditor releases a principal, the surety is discharged, unless (a) the surety consents to remain liable notwithstanding the release, or (b) *the creditor in the release reserves his rights against the surety.*") (emphasis added).

According to the policy, Hartford had several options in response to GLM's claim. "In the event of loss or damage covered by [the policy], at [Hartford's] option, [Hartford] will either: (1) Pay the value of lost or damaged property; (2) Pay the cost of repairing or replacing the lost or damaged property; (3) Take all or any part of the property at an agreed or appraised value; or (4) Repair, rebuild or replace the property with other property of like kind and quality." [8] Therefore, by its terms, the policy makes clear that although Hartford's contractual obligation was triggered by the fire loss, Hartford was under no obligation to fulfill that obligation by paying an amount equal to the limit of insurance held by the insured.[9] Hartford's acceptance of the claim and payment to the limit of the coverage, while forgoing the alternative methods of fulfilment, constituted consideration for the release granted by GLM upon acceptance of the payment.[10] *See, e.g., Frets v. Capitol Fed. S & L Ass'n,* 238 Kan. 614, 712 P.2d 1270, 1276 (1986) (relinquishment of a contract right is sufficient consideration for a promise); *Naylor v. Hall,* 201 Mont. 59, 651 P.2d 1010, 1014 (1982) (same); *Curo v. Citizens Mut. Fire Ins. Co.,* 186 Minn. 225, 242 N.W. 713, 714 (1932) (insurer retained right to "repair or rebuild" even after total loss to property and despite insured's request for cash payment). *See also* 2 JOSEPH PERILLO & HELEN BENDER, CORBIN ON CONTRACTS § 7.12, at 393 (rev. ed. 1995) ("If one has an option between two performances, the giving up of this option, or the exercise of it in one way rather than the other, is consideration for a return promise given in exchange. If one has the privilege of performing in one way rather than another ... the forbearance to exercise the privilege ... can be consideration."); 17A AM.JUR.2D, *Contracts* § 151 (1999); ("As a general rule, the relinquishment or waiver of a legal or contract right or privilege is sufficient consideration for a promise.") The release, then, was given for valid consideration and was effective in accordance with its terms.[11]

*Affirmed.*

---

8. The policy noted that Hartford "will not pay [GLM] more than [GLM's] financial interest in the Covered Property," and that the "Coinsurance percentage" and "Limit of Insurance" may act to set a ceiling on recovery which is less than the actual loss.

9. Unlike the payment to the beneficiary in *Watkins v. Atlantic Life Ins. Co.,* 198 A.2d 911 (D.C.1964), where we deemed a release executed along with receipt of the payment invalid for want of consideration, the payment here was not "the exact amount of the total premiums [already] paid under the policy" nor "was [it] returnable in the event the [loss] was not covered by the policy." *Id.* at 913.

10. Consideration exists regardless of whether Hartford would have preferred to pay the claim rather than rebuild the property even absent the release.
   There is sufficient consideration for a promise if the promisee forgoes some advantage or benefit, or parts with a right which he might otherwise assert. A promisee's surrender of a privilege which he has a legal right to exercise or assert is sufficient consideration for a promise, since *it is a legal detriment irrespective of whether it is an actual detriment or loss to him.*
17A AM.JUR.2D, Contracts § 151 (emphasis added).

11. Given our holding, we do not reach the question whether the trial court was correct in its specific legal conclusion that the present suit was solely a contract claim, barred by the terms of the insurance policy. "As a reviewing court, we are not limited to reviewing the legal adequacy of the grounds the trial court relied on for its ruling; if there is an alternative basis that dictates the same result, a correct judgment must be affirmed on appeal." *Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 628 (D.C.1997).